[S. F. No. 6978.    In Bank.—January 24, 1917.]

## W. F. BOARDMAN COMPANY (a Corporation), Appellant, v. THOMAS D. PETCH, Respondent.

MASTER AND SERVANT—EMPLOYMENT OF MANAGER OF GAS COMPANY—COMPENSATION—CONSTRUCTION OF CONTRACT.—A contract between a gas company and an individual employed to manage its property for a period of five years, providing that such employee should receive for his services the sum of $250 per month, and that in the event the plant was sold during the five years, he should receive, in addition to such salary, six per cent of the profits obtained on the sale, is not terminated as to the salary by the sale of the property within the five years.

CONTRACT—COMPENSATION OF MANAGER OF GAS CORPORATION—SALE OF PROPERTY — EFFECT UPON COMPENSATION — CONSTRUCTION OF CONTRACT.—In this action, brought by a gas corporation to reform a contract which provided for the employment of the defendant as its manager and superintendent and the payment to him for his services of the sum of three thousand dollars per year, in installments of $250 per month for the term of five years, and in addition thereto six per cent of the net profits received on the sale of the property in the event that the property was sold within such term, and if the property was not so sold six per cent of the profits at the end of the term, it is held that the contract was not terminated, in so far as the defendant's right to the monthly salary was concerned, by a sale of the property within the five-year period.

ID.—CONTRACT UPON ASSUMPTION OF CONTINUED EXISTENCE OF SUBJECT MATTER—RULE INAPPLICABLE.—The rule that when parties contract upon the assumption of the continued existence of a given person or property or of certain circumstances, and the person or property ceases to exist or the circumstances change, the obligation is at an end, is not applicable to such contract, as it shows upon its face that the parties were stipulating with a possible sale of the property within five years in mind, and expressly provided for such a contingency.

ID.—TERMINATION OF CONTRACT—LACK OF AUTHORITY OF EMPLOYER.— Any right of the employer to terminate the relation between itself and the employee within the five-year term under such contract was necessarily limited by the language of the provision of the contract whereby the employee undertook "to devote his time, attention, and ability to the management of the property mentioned by using every effort in his power to make it successful"; and as long as the employee did what he agreed to do,—give his time, attention, and ability to the management of the property and use every effort in his power to make it successful,—no grounds existed for a repudiation of its part of the contract by the employer.

ID.—SALE OF PROPERTY—CONTINUANCE OF EMPLOYMENT—PAYMENT BY CHECK OF NEW COMPANY—TERMINATION OF CONTRACT NOT SHOWN BY.—Under such a contract, where a sale of the property was made within the five-year period, and the defendant continued his services in the management and development of the property and also acted as manager of other gas properties of the purchasing company, in which plaintiff was largely interested, if not the controlling factor, the mere fact that the checks for his salary were checks of the new company did not show a termination of his employment under the contract.

ID.—ALLEGED WRONGFUL DISCHARGE — MISMANAGEMENT OF PROPERTIES — ERROR IN REFUSING AMENDMENT TO PLEADING AND REJECTION OF EVIDENCE.—In such a case, where the defendant by cross-complaint asks for damages for an alleged wrongful discharge by the employer, and the latter contended that defendant had mismanaged certain of the properties after the sale, it was error for the court to exclude evidence offered to show a failure on the part of the defendant to comply with his part of the contract in so far as certain properties were concerned, on the theory that the same was not within the issue made by the pleadings, because such properties were not a part of those referred to in the contract, where plaintiff sought to amend its answer to defendant's cross-complaint to obviate the objection, which request was refused on the ground that it came too late.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.   George H. Cabaniss, Judge.

The facts are stated in the opinion of the court.

William C. Crittenden, William A. Nunlist, and Chickering & Gregory, for Appellant.

Frank McGowan, and Elmer Westlake, for Respondent.

ANGELLOTTI, C. J.—The appeal is from a judgment in favor of defendant on a cross-complaint and from an order denying plaintiff's motion for a new trial.

On January 28, 1911, plaintiff and defendant entered into the following contract: "The parties of the first part are the owners of the Rogue River Valley Gas Company, with its principal place of business in the town of Medford, Oregon, and have furnished the entire capital for the erection and completion of the Rogue River Valley Gas Company. . . . The parties of the first part agree to pay the party of the second part the sum of $3,000 per year, in installments of $250 per month for the term of five years from the first day of February, 1911, ending the first day of February, 1916; or if the party of the second part does not begin actual services in Medford at that time, then it is to begin at the date at which the said second party begins actual services in taking charge of the Rogue River Valley Gas Company, but in all events the said party agrees that his services will not begin later than March first, 1911, and as much earlier as he can get away from present position.

"In addition to the salary above mentioned, the parties of the first part agree to pay the party of the second part six per cent of the net profits received by the parties of the first part on the sale of the Rogue River Valley Gas Company, should said sale be made on or before the expiration of five years from the date of the signing of this contract."

Then follows a stipulation as to how the net profits shall be computed if the property is sold within the five years, and, if not sold within said period, how an appraisement shall be made and the increase in the value of the property determined upon which as actual profits shall be computed six per cent which the party of the second part shall receive. The first party then agrees to deliver to the said second party, or his heirs at the time of said sale, this six per cent in cash, or, if the property has not been sold, in stocks or bonds.

"In consideration of the above agreement party of the second part agrees to devote his time, attention and ability to the management of the property mentioned, by using every effort in his power to make it successful.

"In the event of disagreement between both parties, or inability through sickness on the part of the party of the second part to the performance of his duties as general manager

the above contract is to be settled by arbitration in the same manner described theretofore.

"It is understood and agreed that the party of the second part is to have the entire management in outlining the conditions under which this property is to be operated, being under the jurisdiction and control of the following parties, namely: J. R. Anderson, Geo. H. Eckert and W. F. Boardman, or their successors.

"The party of the second part has entered into a five-year agreement with the Rogue River Valley Gas Company on January 18, 1911. This contract includes all terms and provisions in the above five-year agreement, and is made to cover all points and stipulations in same, or in other words, is to take the place of said agreement."

The said contract of January 18th, it may be said, provided for the employment of said party of the second part for the same time and at the same salary as said agreement of January 28th, as manager and superintendent of the Rogue River Valley Gas Company, but there was no reference to any sale of the property. The defendant commenced his services as said manager about February 15, 1911. The property then consisted of a high-pressure gas plant located near Medford, Oregon, and was supplying gas to the towns of Medford, Phoenix, Tallant, and Ashland, all of which, except Medford, were very small towns a few miles apart. The whole cost of the property was $126,778.65. The entire property was thereafter, on June 3, 1911, sold to the Oregon Gas and Electric Company, not for cash, but said company issued to plaintiff in exchange for its rights 195 bonds of the newly organized company of the par value of one thousand dollars each, and in addition gave as a bonus with each bond fifteen shares of its stock of the par value of one hundred dollars each. As a part of this sale consideration, the plaintiff agreed to supervise, for the Oregon Gas and Electric Company, the property purchased, which agreement it has been carrying out. After procuring the property in question the Oregon Gas and Electric Company commenced the development and construction of other gas properties in the towns of Roseburg and Grants Pass, Oregon, where, theretofore, neither the Rogue River Valley Gas Company nor the plaintiff had ever had any property. In order to do this work and to improve the old property the company sold 155 additional bonds for

$139,500 in cash, which was used for said purpose. On March 23, 1912, defendant was discharged from his employment. This action was commenced by the plaintiff to reform said contract of January 28, 1911, so as to conform to the understanding of the parties: (1) "That the said monthly sum of two hundred and fifty dollars should be paid and accepted as payment and in full for all services rendered and to be rendered by the defendant to the said Rogue River Valley Gas Company." 2. "That the services for which plaintiff was to be liable to the defendant were the services which the defendant was to render the Rogue River Valley Gas Company." As to that issue, the court granted a nonsuit, from which no appeal was taken. The defendant filed an answer and cross-complaint, asking for damages upon two grounds, namely, (1) for six per cent of plaintiff's profits from the sale of the property of the Rogue River Valley Gas Company, and (2) for a wrongful discharge. The case was tried before a jury and a verdict rendered for defendant for the sum of $19,323.22. A new trial was sought by plaintiff and the trial judge made a conditional order reducing the verdict to $13,992.84, without specifying any ground for the diminution. Defendant agreed to the reduction and the motion for a new trial was denied. At the trial plaintiff admitted that the defendant's share of the profits at the time, including interest, approximated $3,313.80, and filed its written offer to allow defendant to take judgment for three thousand five hundred dollars.

What we have said is taken from the opinion rendered by the district court of appeal of the third appellate district.

In view of the condition of the pleadings, the theory on which the case was tried, and the concessions to that effect contained in the briefs of both parties, it must be taken as a conceded fact that there was a sale on June 3, 1911, of the Rogue River Valley Gas Company property within the meaning of the contract, and that thereby defendant became entitled as of that date to six per cent of the net profits received by plaintiff on such sale, in cash. At the trial it was admitted by plaintiff that defendant was entitled to receive on this account, including interest, the sum of $3,313.80. Consideration of the record has satisfied us that there is therein no substantial evidence warranting the award of a larger amount on this account. In our opinion, any conclu-

sion of a greater actual profit to plaintiff than $48,721.35 would be based only, as the record now is, upon the merest conjecture and surmise. Defendant was entitled to six per cent on this amount, with interest thereon from the date of sale to the date of verdict.

Justification for the amount of the judgment in excess of $3,313.80 must be found, if at all, in defendant's right to his compensation under the contract for his services from March 1 to March 23, 1912, when he was discharged, and to damages for his alleged wrongful discharge on that date and plaintiff's refusal to pay him the specified $250 per month from that date to February 15, 1916, his employment having commenced February 15, 1911.

It is earnestly urged that under the contract all right on the part of defendant to be paid $250 per month terminated with the sale of June 3, 1911. The theory, of course, is that the contract shows, as it in fact does, that it was one contemplating personal service on the part of defendant in connection with the property of the Rogue River Valley Gas Company, and that it was the intention of the parties that a sale of that property within the five years should *ipso facto* terminate defendant's rights in so far as the payment of $250 per month was concerned, leaving him with a right only to six per cent of the profits obtained by plaintiff by reason of such sale. We are unable so to read the contract. As the contract itself shows, the parties were stipulating, with a possible sale of the property within five years in mind, and expressly provided for such a contingency. This being the situation, plaintiff agreed in so many words to pay defendant three thousand dollars per year, in installments of $250 per month "for the term of five years," and to pay *"in addition to"* this six per cent of the net profits on a sale of the property within five years, and in the event that no sale was made within that time, six per cent of the actual profits of the concern at the end of such five years. In other words, defendant was to receive, in *consideration of his part of the contract*, $250 each month for a term of five years, *together with* six per cent of the net profits of plaintiff in the event of a sale within five years, or if no sale be made within that time, six per cent of the profits of the concern at the end of the five years. In consideration of this undertaking on the part of plaintiff, defendant agreed "to devote his time,

attention, and ability to the management of the property mentioned by using every effort in his power to make it successful.'' If by reason of a sale of the property it followed that there was no longer any property to the management of which for the benefit of plaintiff he could devote his time, attention, and ability, the obligation of plaintiff to pay the stipulated sum was nevertheless in no way impaired or lessened. Authorities to the effect that when parties contract upon the assumption of the continued existence of a given person or property or of certain circumstances, and the person or property ceases to exist or the circumstances change, the obligation is at an end, are not in point, for here the parties did not contract upon any such assumption. As written, the contract plainly shows the intention we have stated, and there is nothing in the circumstances appearing in evidence to indicate any other intention, or that the contract so construed is at all absurd or even unreasonable. In fact, the circumstances tend to support rather than to operate against such construction, and certainly the conduct of the parties until the time of defendant's discharge was in line with such a construction. No one appeared to have supposed that defendant's rights or duties under the contract terminated with the sale. The evidence indicates that plaintiff was in control of the Oregon Gas and Electric Company, the vendee, and that defendant continued as general manager, under the terms of the contract between himself and plaintiff, until the date of his discharge.

The five-year term actually commenced February 15, 1911. Defendant was paid only to March 1, 1912. This left forty-seven and one-half months for which he was not paid, which, at $250 per month, would have yielded $11,875. He received from another source for personal services, one thousand four hundred dollars, leaving a balance of $10,475, as *prima facie* the amount of damage. There is nothing in the evidence to support a larger award on this account.

It thus appears that there is evidence fully supporting an award to defendant of $3,318.80 plus $10,475, an aggregate of $13,793.80, whereas he was given by the modified judgment $13,992.84, an excess of $199.04. We can find no sufficient support in the evidence for this excess.

Defendant's undertaking under the contract was ''to devote his time, attention, and ability to the management of

the property mentioned by using every effort in his power to make it successful.'' Any right of plaintiff to terminate the relation between itself and defendant within the five-year term was necessarily limited by the language of this provision. As long as defendant did what he had agreed to do, give his time, attention, and ability to the management of this property and use every effort in his power to make it successful, no ground existed for a repudiation of its part of the contract by plaintiff.

An examination of the record has satisfied us, as it did the district court of appeal, that the evidence sufficiently sup-ports the conclusion in favor of defendant in this regard, in so far as the particular property owned by the Rogue River Valley Gas Company prior to the transfer is concerned.

As we have seen, immediately after the sale, the new com-pany, the Oregon Gas and Electric Company, commenced the development and construction of other gas properties in Roseburg and Grants Pass, to be operated in conjunction with the property received from the Rogue River Valley Gas Company. Plaintiff was largely interested, if not indeed the controlling factor, in the new corporation, and until the time of his discharge defendant acted as "general manager" of all the properties, receiving his monthly $250 in checks of the new corporation. While, in view of the issues made by the pleadings and the theory on which the case was tried, it must be held, as we have seen, that there was a "sale" of the property within the meaning of the provisions of the contract entitling defendant to a certain percentage of the profits in the event of a sale, there can be no question, in view of the evidence, that it was the understanding of both plaintiff and defendant that defendant was entitled and re-quired under the contract to continue his services in the management and development of the property. The mere fact that the checks for his salary were checks of the new corporation does not detract in the slightest degree from the evidence in this regard. Defendant's contract was for the management and development of the gas plant of the Rogue River Valley Gas Company for the benefit of plaintiff. If without any sale, that company, by increasing its available capital by means of the issuance of bonds and additional stock had extended its operations so as to include Grants Pass and Roseburg territory, there can be no question that

the additional properties would have been a part of the property referred to in the contract as to which defendant's services and management were required. So far as the *property* was concerned, this was what was substantially done. The Rogue River Valley Gas Company property was transferred to a new corporation, in which plaintiff was very largely interested, which, with the aid of additional capital, proceeded to develop the plant by including Roseburg and Grants Pass territory within its operations. Much can be said in support of the theory that, in view of the circumstances, defendant's obligations to plaintiff, under the contract, extended to the whole property operated by the new corporation, including the Roseburg and Grants Pass additions. These were practically simply by way of development of the original plant. The trial court, however, excluded much evidence offered to show a failure on the part of defendant to comply with his part of the contract in so far as the Roseburg and Grants Pass extensions were concerned, on the theory that the same was not within the issues made by the pleadings, because such extensions were not a part of the property referred to in the contract. Complaint is made of the rulings in this regard. Whether this complaint be well based or not, it appears that plaintiff sought to amend its answer to defendant's cross-complaint, to obviate the objection that such evidence was not within the issues. As stated by the district court of appeal, the desire of plaintiff was to show that, if the original contract was not extinguished by the sale, "it was modified or virtually superseded by an executed parol agreement of the parties considerably enlarging the scope of the written one, with the effect that defendant 'became obligated to manage the new property at Grants Pass and Roseburg as well as the original property at Medford, Oregon.' " Upon objection being sustained to testimony in so far as Roseburg and Grants Pass were concerned, plaintiff asked leave to amend the answer in this regard, and later renewed the motion, and the court denied the application, on the ground that it came too late. At the conclusion of the introduction of evidence, plaintiff again moved the court for its permission to amend its answer to the cross-complaint, "in order to make the said answer conform to the evidence introduced at the trial in this action, and also in order to plead more definitely a sub-

sequent executed oral agreement on the part of the defendant and the plaintiff.'' This application was denied. As to this the district court of appeal, in deciding this case, said:

''We cannot resist the conclusion that the court unduly restricted plaintiff in its efforts to establish one vital defense upon which it relied. It may be admitted that its original answer is somewhat defective, but it does appear therein that the original contract was superseded by an employment of defendant by the said Oregon Gas and Electric Company and that by the latter he was discharged for cause. From evidence received without objection it also appears that defendant was employed by said company to manage its plant at various places, including said Grants Pass and Roseburg, but when evidence of his mismanagement at these points was offered an objection was sustained on the ground that it was not within the issues. Immediately, plaintiff requested to amend the pleading, but was denied the privilege. The matter was one of great importance to appellant and involved the consideration of a complete trial upon the merits.

''It would certainly be better, ordinarily, if such motions were not opposed. It may be that counsel for appellant should have been more careful in framing their original pleading, but it is hardly necessary to say that the rigor of the old rules of pleading has been greatly relaxed and the effort of courts is and should be directed to the end that the cause, if possible, may be fully tried and determined.

''Respondent was manifestly awarded $10,000, in round numbers, as damages for his discharge. If he was wrongfully discharged he is entitled to it, but the door should have been open for the fullest investigation as to whether under the original engagement or an added or substituted obligation there was ample justification. If said showing had been made the result might have been, of course, the same. Of that we cannot say, but the consideration to which we have adverted is so vital that we think a new trial should be had.

''There was, indeed, as we have seen, some evidence of the theory contended for, including the declared misconduct of defendant at Grants Pass and Roseburg, but a complete showing was not permitted, and, besides, the court withdrew that consideration entirely from the jury.''

Full consideration has satisfied us that this is correct, and we adopt the same as a part of this opinion.

We do not deem it necessary for the purposes of a new trial to consider any other point made by plaintiff on this appeal further than to say that the real question in regard to the right of plaintiff to terminate the relation existing between it and defendant, as it attempted to do, is whether defendant failed to devote his time, attention, and ability to the management he had assumed, and used every effort in his power to make the property successful. Such was his undertaking.

The judgment and order denying a new trial are reversed.

Shaw, J., Sloss, J., Melvin, J., Henshaw, J., Lorigan, J., and Lawlor, J., concurred.